UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____ X

OMNIA LOTFI,                                                  **VERIFIED COMPLAINT**

              Plaintiff,                    **15 CV 2215**

   -against-

STAR CAREER ACADEMY, MICHELLE MUMMA          **JURY TRIAL DEMANDED**
in her individual capacity, DERRICK RUFFIN in his
individual capacity, ADRIANNA TORTORELLO in her
individual capacity and MICHAEL LEVITT in his
individual capacity,

              Defendants.

_____ X



## NATURE OF ACTION

1.    Plaintiff, OMNIA LOTFI ("LOTFI" or "Plaintiff") brings this action against defendant STAR CAREER ACADEMY ("STAR" or "Defendant") MICHELLE MUMMA ("MUMMA"), DERRICK RUFFIN ("RUFFIN"), ADRIANNA TORTORELLO ("TORTORELLO") and MICHAEL LEVITT ("LEVITT") for damages (compensatory and punitive) for injuries plaintiff has sustained as a result of defendants' discrimination of plaintiff on the basis of gender, national origin, race and religion, sexual harassment and a hostile work environment, in violation of 42 U.S.C. § 1981 ("Section 1981"), the New York State Human Rights Law, New York Executive Law § 296 et seq., (the "Executive Law"), the Administrative Code of the City of New York § 8-107 et seq. (the "City Law")' and all other applicable federal, state and local statutes.

2.    The plaintiff, through her attorneys, the LAW OFFICE OF CHRISTINE A. RODRIGUEZ, complaining of the defendant, respectfully alleges:

## JURISDICTION

3.      Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343(4).  The Court has supplemental jurisdiction over the claims brought under the Executive Law pursuant to 28 U.S.C. § 1367.

4.      As the unlawful practices complained of herein occurred within the Southern District of New York, venue is proper in this District pursuant to 28 U. S. C. § 1391.

5.      The amount in controversy exceeds $75,000.00 excluding interest and costs.

## PARTIES

6.      Plaintiff, is a resident of the County of Brooklyn, State of New York.

7.      Plaintiff is a Middle Eastern female, of Egyptian origin and a practicing Muslim.

8.      From August 3, 2009 until the termination of her employment on May 30, 2014, Plaintiff was employed as a Director of Admissions by Star Career Academy (STAR) at the New York City location.

9.      Defendant STAR is a for-profit network of private, post-secondary schools, providing career training in medical, hospitality, culinary, and business fields at eight campuses in New York, New Jersey and Pennsylvania.  STAR's main office and headquarters is located in, Cherry Hill, New Jersey.

10.     At all times relevant herein, defendant MICHELLE MUMMA (MUMMA) was and remains Vice President of Admissions and Marketing for STAR and she was plaintiff's supervisor.  MUMMA is a Caucasian Italian female and she is not Muslim.

11.     At all times relevant herein, defendant DERRICK RUFFIN (RUFFIN) was and remains Regional Director of Admissions for STAR, assigned to the territory encompassing

plaintiff's work location and was plaintiff's supervisor.  RUFFIN is an African American male and he is not Muslim.

12.     At all times relevant herein, defendant ADRIANNA TORTORELLO (TORTORELLO) was the Executive Director at the New York City campus for STAR and she was plaintiff's supervisor.  TORTORELLO is a Latin American female and she is not Muslim.

13.     At all times relevant herein, defendant MICHAEL LEVITT (LEVITT) was the Chief Operating Officer of STAR and he was plaintiff's supervisor.  LEVITT is a Caucasian male and he is not Muslim.

## FACTUAL ALLEGATIONS

14.     Plaintiff relocated to New York City from Chicago and began working at STAR's New York City location, then known as Career Academy, a culinary school, in August 2009.  As STAR grew it added several technical schools from the region, including Career Academy in 2010, which became known as part of the large entity called STAR CAREER ACADEMY.

15.     Plaintiff was originally recruited to join STAR by a recruiting firm and then by MUMMA, a Caucasian Italian female.

16.     After completing her first year of employment with STAR, Plaintiff received an outstanding review and an employment bonus to commend her for achieving outstanding results with the company.

17.     Plaintiff's work performance was reviewed twice in the four years and ten months that she was employed with Star.  Both times plaintiff received positive reviews.

18.    In 2010, soon after Plaintiff began her employment with STAR, the company expanded from five (5) to eight (8) campuses and a new Regional Director of Admissions was promoted.

19.    Beginning in or about the summer of 2010, after STAR's expansion, plaintiff was no longer reporting directly to MUMMA.  Thereafter, she was required to report to a new Regional Director of Admissions, RUFFIN, an African American male in addition to her current supervisor,  TORTORELLO, a Venezuelan female of light complexion.

20.    TORTORELLO was plaintiff's primary supervisor, but she was still required to report to and communicate with MUMMA and RUFFIN on a daily basis.

21.    Plaintiff's first encounter with RUFFIN was during a training session at Atlantic City, in August 2009 shortly after she was hired, where he informed her that they would be working "closely together" and that she seemed "cool."

22.    Shortly thereafter, RUFFIN began sexually harassing plaintiff during routine campus visits by staring at her inappropriately and making sexually charged comments that made plaintiff uncomfortable.

23.    On many occasions, beginning on or about September 2010, after RUFFIN began to coach plaintiff and review procedures as part of his role as Regional Director, plaintiff would have to work with him alone in her office at the New York City campus.  Often during these times, RUFFIN would close the door and suggest to plaintiff that they were "both adults and can [sic] do adult things."  RUFFIN stated to plaintiff on one such occasion that he never dated an Arab Muslim Egyptian, but that he had dated a girl from Saudi Arabia.  RUFFIN also repeatedly commented to plaintiff that MUMMA suggested that he and plaintiff "hook up" and that they would make a good couple.

24.     RUFFIN told plaintiff that he was careful with whom he discussed the women he was interested in and that he made sure to only make advances to those women at work that he was sure would not say anything.  RUFFIN often joked that this was "no big deal" because it was "strictly adult things" and "no strings attached," in other words, not a relationship, just sexual relations.

25.     After plaintiff's first encounter with RUFFIN in plaintiff's office, RUFFIN told plaintiff that MUMMA encouraged RUFFIN's pursuit of plaintiff because she thought they were a "good match" but it should be kept a secret.

26.     MUMMA, on several occasions made references to RUFFIN as a "lady's man" laughing about it when on conference calls with plaintiff.

27.     Plaintiff was uncomfortable with RUFFIN's sexual advances towards her and anytime he approached her or made a comment to her plaintiff repeatedly informed him that she was in a relationship and was not interested in him to which he responded "we are both in a relationship and no one needs to know", "it's no big deal" because "we are grown."

28.     Once or twice a month between August of 2009 and early 2012, whenever RUFFIN was staying in New York City and during conferences in Atlantic City, he would inform plaintiff of what hotel he was staying in and would invite her to join him in his hotel room or to meet him at the bar.

29.     Plaintiff did not accept any of these invitations from RUFFIN.

30.     In March of 2010, RUFFIN shared with plaintiff that he had a dream about her, fantasized about being with her and about her breasts.

31.     Plaintiff told RUFFIN that she did not want to hear these comments and that they made her uncomfortable.  She avoided RUFFIN and would only speak to him about work. RUFFIN did not cease making these comments.

32.     Around March of 2011, despite plaintiff's unequivocal rejection of his sexual advances, RUFFIN proceeded to ask plaintiff out to dinner for her birthday, telling her that he wanted to celebrate with her.

33.     Plaintiff again rebuffed RUFFIN's advances and informed him that she was not interested.

34.     RUFFIN continued his unwelcomed pursuit of plaintiff by suggesting that "everyone is on the road and does it, there is nothing wrong with it, and many other people in the corporate office do this."

35.     Roland Rodriguez, plaintiff's co-worker, was present when RUFFIN told plaintiff that he wanted to take her out to dinner and that RUFFIN would be her dessert.

36.     Mr.  Rodriguez   reported   RUFFIN's   inappropriate   behavior   defendant TORTORELLO, the Campus Director and one of plaintiff's direct supervisors.

37.     Mr. Rodriguez informed TORTORELLO that RUFFIN was a sexual predator and that he knew RUFFIN had made inappropriate advances to women in each of STAR's eight campuses.  TORTORELLO asked Mr. Rodriguez if plaintiff was one of the woman that RUFFIN had made inappropriate advances to and he replied yes and suggested that TORTORELLO speak directly to plaintiff.

38.     Sometime in or about September 2011 David Hammond, President of the Long Island campus and RUFFIN's friend, was fired for having sexual relations with a subordinate employee, some of which took place on STAR's Long Island campus.

39.    After Hammond was fired, RUFFIN vouched for Hammond's unscrupulous behavior and told plaintiff that Mr. Hammond made a mistake in telling the wrong people about his sexual relations.

40.    Soon after Mr. Rodriguez reported RUFFIN, Plaintiff learned about his report and that TORTORELLO was now aware of RUFFIN's inappropriate behavior towards her and other women, but refused to take any action.  Plaintiff was never approached by any of her supervisors about Mr. Rodriguez's report.

41.    After learning of TORTORELLO's response, plaintiff felt like she had no support from STAR's administration since it now appeared to her that the campus's Human Resource Department and her other supervisors were acting in support of and to protect RUFFIN.

42.    Plaintiff did not know what to do and was fearful that she would be retaliated against and lose her job if she pressed the matter further, so she did not at the time.

43.    Plaintiff had been reluctant to report RUFFIN sooner for fear of losing her good standing in the company and fear of retaliation, which was now justified by TORTORELLO's lack of action upon hearing a report of RUFFIN's behavior from Mr. Rodriguez.

44.    Plaintiff also feared speaking out due to the noticeably close relationship between RUFFIN and MUMMA, Vice President of Admissions and Marketing.

45.    At some point in early 2012, RUFFIN's relentless sexual advances towards plaintiff subsided he stopped making comment about his desires to have sex with the plaintiff. However, at about the same time, company management began acting differently towards plaintiff and plaintiff's once commended work performance was now being closely scrutinized and constantly criticized by her supervisors.

46.     RUFFIN began to retaliate against plaintiff and would make false reports to MUMMA and TORTORELLO, defaming plaintiff's character, work ethic, and her management skills, despite the fact that she was actually fulfilling all of the requirements of her position and exceeding expectations.

47.     Because RUFFIN was a Regional Director, responsible for visiting and evaluating several campuses, his criticism of plaintiff began to have a negative impact on her work environment and overshadowed her good performance.  This was particularly apparent as new corporate staff was hired by STAR in subsequent years who had not yet had a chance to work directly with plaintiff before getting feedback from RUFFIN on plaintiff's performance.

48.     Plaintiff and her team endured constant unsubstantiated criticisms for failure to complete tasks, not listening to superiors, and for "always having excuses."

49.     Due to RUFFIN's retaliatory acts, plaintiff was now labeled as an insubordinate employee and told by MUMMA and her direct supervisor TORTORELLO that her insistence on protecting her team was her "Achilles heel."

50.     In July 2012, RUFFIN's sexually inappropriate behavior resumed, but this time it involved another employee supervised by plaintiff, Desiree Montanez.

51.     On July 18, 2012, while celebrating at a lounge after a corporate event, RUFFIN made several sexually explicit remarks towards Ms. Montanez and mimicked exposing his genitals in front of plaintiff and several other employees who were present.  Plaintiff was present when this occurred.

52.     Additionally, RUFFIN continued to discuss his interest in other female employees by making inappropriate comments in plaintiff's presence.  For example, between August 2012 and November 2012, RUFFIN made repeated inappropriate comments to plaintiff about how he

intended to have a sexual affair with TORTORELLO.  RUFFIN repeated told plaintiff that TORTORELLO, the supervisor who had already received a complaint about RUFFIN's behavior towards plaintiff and had taken no action, wanted RUFFIN and that she wanted RUFFIN to "give it to her."

53.     Ms. Montanez made a formal sexual harassment complaint against RUFFIN to plaintiff on April 30, 2013.  Plaintiff forwarded the complaint to TORTORELLO on May 1, 2013.

54.     According to that complaint, after the July 2012 incident, RUFFIN confronted the Ms. Montanez on October 25, 2012 to interrogate her about whether or not she reported the incident to MUMMA.

55.     The complaint also stated that on February 19, 2013, during a training session at the New York office, RUFFIN congratulated Ms. Montanez on her "great ideas" and rubbed her thigh.  When Ms. Montanez confronted RUFFIN about this, he told the Ms. Montanez that he did not mean to touch her.

56.     The complaint also stated that on March 7, 2013, came by the Ms. Montanez's desk to tell her he had seen an improvement in her attitude, at which time RUFFIN also rubbed the Ms. Montanez's back and told her to "keep up the good work."

57.     Plaintiff was interviewed by STAR's Vice President of Compliance, Ann Bouse and TORTORELLO about Ms. Montanez's complaint.

58.     Despite RUFFIN's inappropriate behavior, things remained the same on campus and nothing was done about the July 2012 episode or the other incidents in Ms. Montanez's complaint.

59.     Plaintiff's performance and that of her team continued to be heavily scrutinized by her supervisors.

60.     Plaintiff's efforts to continue to do a good job and protect her staff from unfair criticism were consistently undermined by her supervisors and her department gained the reputation of being the negative unit.   Plaintiff realized that MUMMA was now closely monitoring her every move and RUFFIN would make false reports about her work performance in an attempt to make things difficult around the workplace.

61.     The actions of MUMMA and RUFFIN, created an environment in which everyone who knew about RUFFIN's deviant behavior was afraid to report it because they feared becoming a target and further retaliation.  Staying quiet to avoid getting fired became a survival strategy on the New York STAR campus.

62.     Plaintiff, in speaking with staff under her supervision, became aware that RUFFIN had in fact also made inappropriate comment to and harassed various other female employees at the New York campus two of which were Fatima Ahmed and Joanny Vidal.

63.     Ms. Ahmed, another Muslim female, was eventually fired in September 2013 after taking a leave of absence due to the stress from the hostile environment at the New York City location.   Ms. Ahmed had endured inappropriate comments and behavior from RUFFIN August and October 2011 and then again in March and February 2013.  Ms. Ahmed took medical leave in June 2013 due to stress related to RUFFIN's behavior.

64.     RUFFIN repeatedly commented, in front of plaintiff, on how great Ms. Ahmed's figure looked and he made comments about plaintiff and Ms. Ahmed and his desire to date Arab women.

65.     Ms. Ahmed repeatedly rebuffed RUFFIN's advances, as did plaintiff and after doing so found herself the subject of retaliatory conduct.

66.     MUMMA made it known to plaintiff that she did not like Ms. Ahmed and plaintiff was encouraged to find a reason to fire Ms. Ahmed after she refused to endure RUFFIN's behavior or entertain his advances.

67.     Plaintiff's supervisors continued to push plaintiff to find reasons to write up Ms. Ahmed and justify terminating her employment.  Plaintiff would not comply with these requests, but tried to manage the situation in a reasonable manner by not disciplining Ms. Ahmed without cause to do so.

68.     Plaintiff was accused of trying to protect Ms. Ahmed mainly because they both shared the same religion, Islam, and Arab origin.  MUMMA commented that there was concern and a belief that Ahmed was related to plaintiff and that Ahmed was engaged to a relative of plaintiff, neither of which was true.  In fact, plaintiff first met Ms. Ahmed when she began working for STAR.

69.     The STAR supervisors were making it impossible for plaintiff to perform her job effectively and ethically.

70.     Ms. Ahmed became so emotionally distraught over the hostile work environment at the New York STAR campus that in or about June 2013 she suffered a breakdown and never returned to work.

71.     Ms. Ahmed complained of RUFFIN's behavior through her therapist while she was out on medical leave, who then reported it to Jonell Quinones, Director of Facilities and Purchasing at STAR.  Mr. Quinones was one of Ms. Ahmed's supervisor's.  Mr. Quinones then

reported Ms. Ahmed's complaint to STAR President Steve Dumerve in July 2013.  Ms. Ahmed was fired when she asked for additional medical leave in September 2013.

72.     In June 2012, Ms. Vidal had been promised a raise by RUFFIN, but did not receive the increase after also rebuffing RUFFIN's inappropriate advances.

73.     The hostile environment and the supervisors' retaliatory tactics around the work place began affecting the plaintiff's team's overall performance.  No matter what plaintiff did, the negative treatment continued.

74.     On July 4, 2013, plaintiff was required to report to work to supervise the only campus open during the holiday.

75.     Plaintiff's workload continued to increase beyond what was reasonable, forcing her to work on holidays and well beyond her normal scheduled work hours.  Nonetheless, plaintiff's supervisors continued to overly criticize her work performance in what plaintiff perceived as an effort to force plaintiff to quit.

76.     Whenever plaintiff made an effort to report legitimate complaints from her employees she was instructed to ignore them and focus on "the numbers."

77.     After Ms. Ahmed left STAR, plaintiff later learned that RUFFIN had also sexually harassed several other employees, including, Cassandra Hill, Rosie Vargas, Ginny Bradford, Nairoby Angles and Tonya Brown.

78.     In February of 2013, when plaintiff took her first vacation from work in three (3) years, she was reprimanded upon her return to work for not being on top of the performance of her department's staff.

79.     Notably, plaintiff took this first and only vacation during her tenure at STAR to visit the Middle East and complete her Islamic religious pilgrimage to Mecca.  Her supervisors were aware that this was the purpose of her taking time off in February 2013.

80.     Prior to this vacation, plaintiff had never taken any extended time off from work but was required to meet with one of her supervisor TORTORELLO upon her return and a "record of conversation" was added to her work file to document the reprimand.

81.     Plaintiff objected to and complained about the discipline to her supervisor TORTORELLO, noting that she believed it was due to her taking off to attend to her religious pilgrimage

82.     Moreover, before February 2013, and continuing after, plaintiff was repeatedly denied permission to take off days or leave early for religious holidays.

83.     Plaintiff was also denied a request to modify her work schedule during Ramadan, which fell during the summertime in the years plaintiff worked for STAR.  Ramadan is a high holy time for practicing Muslims during which the fast from sunrise to sunset for an entire month.  Plaintiff simply sought to leave work in time to break her fast for each day during Ramadan, but was repeatedly required to stay in the office after sun down during those months.

84.     During Ramadan, MUMMA would taunt plaintiff during the work day when MUMMA was in the New York office by repeatedly asking plaintiff if she needed something to eat during the course of the day and telling her that she really had to eat something.

85.     Plaintiff's work schedule was closely monitored by her supervisors, particularly after complaints about RUFFIN came to light and plaintiff lent her support to employees who had reported RUFFIN's inappropriate comments.

86.     Plaintiff found herself constantly working ten-hour days and afraid to take any days off or take regular lunch breaks for fear of retaliation or losing her job.

87.     On many work days, MUMMA would call plaintiff as early as seven o'clock in the morning or as late as seven o'clock at night to discuss her daily activities.

88.     MUMMA would also routinely investigate around the office during the work day, disrupting both plaintiff and her staff and interrogating staff in an effort to obtain negative information she could use against plaintiff during their daily meetings.

89.     When rumors of a workers union began circling around the STAR campus in 2013, plaintiff was asked to help weed out the pro-union employees to be fired, which she declined to do.

90.     On February 14, 2014, plaintiff and Desiree Montanez were called into a meeting with LEVITT and Campus President Steve Dumerve.  The purpose of the meeting was to discuss management's desire to have RUFFIN present on the New York STAR campus once again to help with enrollment numbers.

91.     RUFFIN had not been regularly present on the campus since Ms. Montanez's formal complaint in July 2013.  Plaintiff expressed her concerns about this to LEVITT but her concerns were dismissed.

92.     During that meeting, Ms. Montanez expressed her displeasure and began stating aloud that RUFFIN was a sexual predator who had harassed other women on campus, naming plaintiff among RUFFIN's victims.  It was clear that LEVITT and Demurve now knew about RUFFIN's advances to plaintiff in addition to TORTORELLO and MUMMA.

93.     Plaintiff continued to be reprimanded unfairly for poor performance and low enrollment numbers after Ms. Montanez's outburst.  Plaintiff was instructed by MUMMA to

make extraordinary efforts to enroll students at any cost and MUMMA told plaintiff that she had everything she needed to meet her goals.

94.     By April 2014, MUMMA began to come to the STAR's New York campus office every day and she would sit outside of plaintiff's office the entire day in an effort to unsettle and intimidate plaintiff.

95.     Plaintiff believed that she had been targeted because her supervisors were now aware that she had not only tried to help other co-workers who complained about sexual harassment by RUFFIN, but that she herself was a victim.

96.     On April 26, 2014, plaintiff went into the office on a Saturday to catch up and finish a plan of action requested of her by MUMMA.  While at the office that day, members of plaintiff's staff informed her that LEVITT was giving the admissions director of another professional school, who was known to plaintiff, a tour of the facility which is customarily done during the interview process for new staff.  It was not usual practice for LEVITT to be on the New York City campus on the weekend.  When plaintiff confronted LEVITT about why he was in the office on Saturday, he claimed that he was just in the area to visit the Farmer's Market.

97.     Believing that her situation would not improve despite her complaints, efforts to manage her team effectively and constant long hours at the office, and in light of the fact that plaintiff believed that STAR was actively looking to terminate her and interviewing a candidate to replace her, plaintiff decided that she had no choice but to resign on April 28, 2014.

98.     Instead of taking her resignation, Mr. Dumerve was advised by STAR's corporate office to ask plaintiff to stay on.  However, at the same time, he informed plaintiff that he was leaving the New York City Office to take a position at the Long Island campus.

99.     On April 29, 2014, MUMMA came to the New York City office and offered plaintiff a demotion with a reduction in pay, which plaintiff rejected.  MUMMA told plaintiff that she was set up for failure from the beginning of her time at STAR, that she did not have the tools she needed to succeed there and that she knew plaintiff could do "great things."  MUMMA also told plaintiff that STAR needed time to find a replacement for plaintiff's position.

100.    Dumerve interceded and negotiated with STAR's corporate office for plaintiff to stay while STAR sought a replacement.

101.    On May 7, 2014, Dumerve's last day in the New York City office, Gary Duchnowski was introduced as the new president for that location.  Plaintiff met with Duchnowski who told plaintiff that he did not want to see any staff leave and that they would "work closely together" on a "new chapter."

102.    MUMMA continued to sit outside of plaintiff's office everyday that she was on the New York campus and there was no change in the work environment despite Duchnowski's representation.

103.    Due to the stress plaintiff suffered up to this point, on May 15, 2014, plaintiff became so ill and dizzy from anxiety that she was rushed to an urgent care center and advised to stay home for two days on bed rest.  Additionally plaintiff sought medical treatment because she began to develop hives whenever she had to speak to MUMMA or RUFFIN called her on the phone at the office.

104.    On May 22, 2014 MUMMA came to the New York City office with Susan Costello, the Admissions Director from Newark campus to conduct "group interviews."

105.    In fact, though plaintiff was not aware of her replacement, Costello replaced plaintiff after she was terminated later in May 2014.

106.    During Costello's visit on May 22, 2014, plaintiff's staff asked her if this was her last day, to which she responded assuring them that they would be given ample notice before she left.

107.    On May 23, 2014, plaintiff informed COO Levitt about MUMMA and Costello's visit the day before.  Plaintiff also told Levitt that she had assured her staff they would have notice of her departure.  Levitt assured plaintiff that he was "a man of his word" referring to the agreement negotiated by Dumerve that plaintiff receive one month's notice with pay if she were replaced.

108.    However, on May 30, 2014 at approximately 10a.m. plaintiff was called into Mr. Duchnowski's office where he had MUMMA on the phone.  Plaintiff was then advised that she was immediately relived of her duties and that her services were no longer needed, as they were "accepting [her] resignation."   MUMMA then informed plaintiff that they would honor her request for one month's paid notice, but would simply provide it to me via an indemnification agreement and that she should stay home and look for a job "without stress."

109.    Plaintiff received a severance agreement from STAR for one month's pay which required her to waive all legal claims concerning her employment, including sexual harassment and hostile work environment.  Plaintiff declined the severance agreement.

**First Cause of Action**
**<u>Discrimination and Retaliation in Violation of 42 U.S.C. §1981 (Section 1981)</u>**

110.    Plaintiff repeats, reiterates and realleges paragraphs 1 to 109 of this complaint as if fully set forth herein.

111.    Section 1981 prohibits discrimination on the basis of race and color in the terms, conditions and privileges of employment and retaliation for a person's opposition to race and color discrimination and engaging in any activity protected under Section 1981.

112.    At all times relevant herein, plaintiff was an employee and a qualified person within the meaning of Section 1981 and a member of one of the various classes of persons protected by Section 1981 as a non-white Egyptian female.

113.    As described above, defendants, with malice and with reckless indifference to plaintiff's federally protected rights, willfully discriminated against plaintiff in the terms and conditions of her employment by denying her the same benefits and privileges given to similarly situated employees, unjustly and unfairly disciplining plaintiff in a manner not done to similarly situated employees and retaliating against plaintiff for opposing defendants' racially discriminatory practices by the conduct described above.

114.    Defendants' unwarranted discipline and the decision to terminate plaintiff's employment constituted retaliation in violation of Section 1981.

115.    Defendants engaged in their retaliatory actions with malice and with reckless indifference to plaintiff's federally protected rights.

116.    Defendants' actions described above directly and proximately have caused, and continue to cause, plaintiff to suffer loss of income and other financial benefits, a loss of future professional opportunities and future income, anguish, pain and suffering, humiliation, indignity, personal embarrassment, and damage to her professional reputation.

**Second Cause of Action**
**Sexual Harassment in the Workplace in Violation of the**
**New York State Human Rights Law**

117.    Plaintiff repeats, reiterates, and realleges paragraphs 1 to 116 of this complaint as if fully set forth herein.

118.    By the acts and practices and their course of conduct described above, defendants have violated the New York State Human Rights Law, Executive Law §§ 290 to 297 by sexually harassing and allowing, aiding and abetting the sexual harassment of plaintiff.

119.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish and humiliation as a result of defendants' unlawful acts.

**Third Cause of Action**
**Hostile Work Environment in Violation of the**
**New York State Human Rights Law**

120.    Plaintiff repeats, reiterates, and realleges paragraphs 1 to 119 of this complaint as if fully set forth herein.

121.    By the acts and practices and their course of conduct described above, defendants have violated the New York State Human Rights Law, Executive Law §§ 290 to 297 by fostering, creating, aiding and abetting in a hostile work environment.

122.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish and humiliation as a result of defendants' discriminatory acts.

**Fourth Cause of Action**
**Sexual Harassment in the Workplace in Violation of the**
**New York City Human Rights Law**

123.     Plaintiff repeats, reiterates, and realleges paragraphs 1 to 122 of this complaint as if fully set forth herein.

124.     By the acts and practices and their course of conduct described above, defendants have violated the New York City Human Rights Law, Administrative Code of the City of New York § 8-107 et seq., by sexually harassing and allowing, aiding and abetting the sexual harassment of plaintiff.

125.     Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish and humiliation as a result of defendants' unlawful acts.

**Fifth Cause of Action**
**Hostile Work Environment in Violation of the**
**New York City Human Rights Law**

126.     Plaintiff repeats, reiterates, and realleges paragraphs 1 to 125 of this complaint as if fully set forth herein.

127.     By the acts and practices and their course of conduct described above, defendants have violated the New York City Human Rights Law, Administrative Code of the City of New York § 8-107 et seq., by fostering, creating, aiding and abetting in a hostile work environment.

128.     Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish and humiliation as a result of defendants' discriminatory acts.

**Sixth Cause of Action**
**Race Discrimination in Violation of the Executive Law**

129.     Plaintiff repeats, reiterates, and realleges paragraphs 1 to 128 of this complaint as if fully set forth herein.

130.     By the acts and practices described above, defendants have discriminated against plaintiff and aided and abetted in discrimination in the terms and conditions of her employment by acting adversely against her on the basis of her race, including but not limited to subjecting plaintiff to unfair discipline and standards and terminating plaintiff's employment as a result, in violation of the Executive Law §§ 290 to 297.

131.     Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish and humiliation as a result of defendants' discriminatory acts.

**Seventh Cause of Action**
**National Origin Discrimination in Violation of the Executive Law**

132.     Plaintiff repeats, reiterates, and realleges paragraphs 1 to 131 of this complaint as if fully set forth herein.

133.     By the acts and practices described above, defendants have discriminated against plaintiff and aided and abetted in discrimination in the terms and conditions of her employment by acting adversely against her on the basis of her national origin, including but not limited to subjecting plaintiff to unfair discipline and standards and terminating plaintiff's employment as a result, in violation of the Executive Law §§ 290 to 297.

134.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish and humiliation as a result of defendants' discriminatory acts.

**Eighth Cause of Action**
**Religious Discrimination in Violation of the Executive Law**

135.    Plaintiff repeats, reiterates, and realleges paragraphs 1 to 134 of this complaint as if fully set forth herein.

136.    By the acts and practices described above, defendants have discriminated against plaintiff and aided and abetted in discrimination in the terms and conditions of her employment by acting adversely against her on the basis of her religion, including but not limited to subjecting plaintiff to unfair discipline and standards and terminating plaintiff's employment as a result, in violation of the Executive Law §§ 290 to 297.

137.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish and humiliation as a result of defendants' discriminatory acts.

**Ninth Cause of Action**
**Racial Discrimination in Violation of the Administrative Code**

138.    Plaintiff repeats, reiterates and realleges paragraphs 1 to 137 of this Complaint as if fully set forth herein.

139.    By the acts and practices described above, defendants have discriminated against plaintiff and aided and abetted in discrimination in the terms and conditions of her employment by acting adversely against her on the basis of her race, in violation of the Administrative Code.

140.    Defendants acted with malice and/or reckless indifference to plaintiff's statutorily protected rights.

141.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish and humiliation as a result of defendants' discriminatory acts.

## Tenth Cause of Action
### National Origin Discrimination in Violation of the Administrative Code

142.    Plaintiff repeats, reiterates and realleges paragraphs 1 to 141 of this Complaint as if fully set forth herein.

143.    By the acts and practices described above, defendants have discriminated against plaintiff and aided and abetted in discrimination in the terms and conditions of her employment by acting adversely against her on the basis of her national origin, in violation of the Administrative Code.

144.    Defendants acted with malice and/or reckless indifference to plaintiff's statutorily protected rights.

145.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish and humiliation as a result of defendants' discriminatory acts.

## Eleventh Cause of Action
### Religious Discrimination in Violation of the Administrative Code

146.    Plaintiff repeats, reiterates and realleges paragraphs 1 to 145 of this Complaint as if fully set forth herein.

147.    By the acts and practices described above, defendants have discriminated against plaintiff and aided and abetted in discrimination in the terms and conditions of her employment by acting adversely against her on the basis of her religion, in violation of the Administrative Code.

148.    Defendant acted with malice and/or reckless indifference to plaintiff's statutorily protected rights.

149.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish and humiliation as a result of defendants' discriminatory acts.

**Twelfth Cause of Action**
**Retaliation in Violation of the Executive Law**

150.    Plaintiff repeats, reiterates, and realleges paragraphs 1 to 149 of this complaint as if fully set forth herein.

151.    By the acts and practices described above, defendants have retaliated against plaintiff for complaining of and opposing racial, national origin and religious discrimination, sexual harassment and a hostile work environment in violation of the Executive Law.

152.    Plaintiff is now suffering irreparable injury and monetary damage from defendants' retaliatory conduct and will continue to do so unless and until the Court grants relief.

**Thirteenth Cause of Action**
**Retaliation in Violation of the Administrative Code**

153.    Plaintiff repeats and realleges paragraphs 1 to 152 of this Complaint as if fully set forth herein.

154.    By the acts and practices described above, defendant have retaliated against plaintiff for complaining of and opposing racial, national origin and religious discrimination, sexual harassment and a hostile work environment in violation of the Administrative Code.

155.    Defendant acted with malice and/or reckless indifference to Plaintiff's statutorily protected rights.

156.   Plaintiff is now suffering irreparable injury and monetary damage from defendants' retaliatory conduct and will continue to do so unless and until the Court grants relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter an award:

(a)   directing defendants to pay plaintiff compensatory damages, in an amount that exceeds the jurisdictional minimum of this court, including, but not limited to back pay, front pay and benefits;

(b)   directing defendant to pay plaintiff punitive damages;

(c)   directing defendant to pay an additional amount to compensate plaintiff for the emotional distress and reputational damage defendants' unlawful conduct has caused plaintiff, an amount that exceeds the jurisdictional minimum of this court

(d)   awarding plaintiff such interest as is allowed by law;

(e)   awarding plaintiff his reasonable attorneys' fees and costs; and

(f)   granting such other and further relief as the Court deems necessary and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Plaintiff demands trial by jury in this action of all issues so triable.

Dated:  New York, New York
      March 16, 2015

               LAW OFFICE OF
               CHRISTINE A. RODRIGUEZ

               Christine A. Rodriguez, Esq.
               Attorneys for Plaintiff
               1350 Avenue of the Americas, 2nd Floor
               New York, New York 10019
               (212) 430-6525

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| ————————————————————————x | | |
| OMNIA LOTFI, | : | |
| | : | Docket No.: |
| Plaintiff | : | __CV____ (_____) |
| | : | |
| -against- | : | |
| | : | |
| STAR CAREER ACADEMY, MICHELLE MUMMA | : | |
| in her individual capacity, DERRICK RUFFIN in his | : | |
| individual capacity, ADRIANNA TORTORELLO in her | : | |
| individual capacity and MICHAEL LEVITT in his | : | |
| individual capacity, | : | |
| | : | |
| Defendants. | : | |
| ————————————————————————x | | |

## VERIFICATION

STATE OF NEW YORK         )
                                              )
COUNTY OF NEWYORK   )

OMNIA LOTFI, duly sworn, deposes and says:

I am the Plaintiff in the above entitled action. I have reviewed the foregoing COMPLAINT and know the contents to be true to my own knowledge, except to those matters alleged to be upon information and belief, and as to those matters, I believe them to be true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

_____
OMNIA LOTFI

Sworn to before me this _20th_ day
of March, 2015

_____
Notary Public

My Commission Expires on_____

CHRISTINE A. RODRIGUEZ
Notary Public, State of New York
No. 01RO6...
Qualified in ... County
Commission Expires August 22, 2018

*Index No. __ CV_____*                                    *Year  2015*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

═══════════════════════════════════════════

OMNIA LOTFI,

                           Plaintiff,

         -against-
                             :

STAR CAREER ACADEMY, MICHELLE MUMMA
in her individual capacity, DERRICK RUFFIN in his
individual capacity, ADRIANNA TORTORELLO
in her individual capacity and MICHAEL LEVITT in his
individual capacity,

                       Defendants.

═══════════════════════════════════════════

# COMPLAINT

═══════════════════════════════════════════

**LAW OFFICE OF CHRISTINE A. RODRIGUEZ**

**ATTORNEYS FOR
PLAINTIFF, OMNIA LOTFI**

**1350 AVENUE OF THE AMERICAS
2ND FLOOR
NEW YORK, NY 10019
(212) 430-6525**

═══════════════════════════════════════════

*Dated:* March 16, 2015